# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

MELISSA MULLIGAN,            )
                             )
    Plaintiff,           )
                             )
v.                           )   Case No. CIV-23-142-JAR
                             )
UNITED STATES OF AMERICA,    )
                             )
    Defendant.           )

## OPINION AND ORDER

Plaintiff brings this action for medical malpractice stemming from the care she received at the Jack C. Montgomery Muskogee Veterans Administration medical center. On August 5, 2024, this Court conducted a non-jury bench trial with regard to the outstanding issues in dispute in this action. Prior to the trial, the parties submitted proposed findings of fact and conclusions of law. This Court has considered all of the evidence presented by way of live testimony, depositions, exhibits and stipulations as well as the parties' proposed findings and conclusions in the formulation of this Order. After said consideration, this Court hereby enters the following findings of fact and conclusions of law in conformity with Fed. R. Civ. P. 52:

## FINDINGS OF FACT

1.    Plaintiff is a veteran who returned from active military duty in May of 2017 at the age of forty-five. Therefore, she was eligible to receive medical care and treatment from the Veterans Administration ("VA"). In June of 2017, Plaintiff sought care at the Jack C. Montgomery Medical Center located in Muskogee,

Oklahoma.  *Joint Exh. No. 1, p. 732.*

2.     On July 18, 2017, Plaintiff was attended by Dr. Linh Stephens, D.O. complaining of "burning" bilateral hip pain.  *Joint Exh. No. 1, p. 734.*   She was referred out for an MRI to an outside facility by the VA.   The MRI showed degenerative disc disease in her lumbar and cervical spine.  *Joint Exh. No. 1, p. 695.*

3.     Dr. Stephens documented that Plaintiff had no abdominal or gastrointestinal issues.  *Joint Exh. No. 1, p. 736.*

4.     On February 28, 2018, Plaintiff called the Muskogee VA clinic and spoke with Jennifer Wheaton, LPN.  Ms. Wheaton documented, "Patient has been having issues with her bowels.  She goes non-stop for 2 or 3 days or can't go for 2 or 3 days."  *Joint Exh. No. 1, p. 693.*   Plaintiff testified that this represented an abrupt change in her bowel habits.   Ms. Wheaton "advised Ms. Mulligan that the provider is sending her some Fiber and Probiotics to take while waiting for the focus visit appointment because clinic is booked out. I advised her that if she experienced severe abdominal pain or blood in the stools she is to contact us and report to the ER while she waited for her appointment. Veteran verbalized good understanding."  *Joint Exh. No. 1, p. 692.*

5.     On April 6, 2018, Plaintiff was attended by Dr. Stephens.  He noted Plaintiff complained of irregular bowel movements.   She reported that she would have no bowel movements for two weeks followed by two to three days of loose stools.  Dr. Stephens diagnosed Plaintiff with irritable bowel syndrome ("IBS")

and prescribed Bentyl for the condition, probiotics, fiber, and behavioral health counseling. *Joint Exh. No. 1, p. 678.*

6. On May 24, 2018, Dr. Stephens attended a routine follow-up. He noted Plaintiff's diagnosed IBS was "controlled."

7. On May 24, 2019, nurse practitioner Christi Boswel attended Plaintiff for her annual examination. Plaintiff showed no signs of anemia, denied any weight change, and denied hematochezia. Her IBS was noted as "stable." On the same date, Plaintiff related that she was taking a reduced dosage of Bentyl. This level of the medication would not do anything for the symptoms of colorectal cancer. *Depo. of Dr. Zev Wainberg, p. 12, ll. 107, 16-25).* It was also noted in the record that Plaintiff was not due for a colonoscopy until she was 50 years old in accordance with colorectal cancer screening guidelines in place at the time of the examination. *Depo. Of Dr. Zev Wainberg, p. 27, ll. 18-21.*

8. On October 22, 2020, physician's assistant Carrie Randall attended Plaintiff for her annual examination. Plaintiff stated she was experiencing lower back pain. Plaintiff asked that a colonoscopy be performed, complaining of ongoing issues with constipation and diarrhea. Plaintiff did not report accompanying bleeding.

9. On October 22, 2020, PA Randall ordered a fecal immunochemical test ("FIT") for Plaintiff to complete at home. Plaintiff did not complete the test. A FIT test screens for colon cancer by testing for hidden blood in the stool.

10. On December 30, 2020, Dr. James Pritchett, an emergency physician

contractor, attended Plaintiff when she presented to the emergency department complaining of constipation lasting for three days. Plaintiff indicated that she had blood and mucous in her last bowel movement. No rectal examination was performed at that visit. This visit represented the first time Plaintiff reported rectal bleeding to a medical professional. *Depo. of Dr. Zev Wainberg, p. 30, ll. 1-13.*

11. Plaintiff reported no other indicative symptoms such as anemia, unexplained fatigue or unexplained weight loss to VA medical providers. *Depo. of Dr. Zev Wainberg, p. 53, l. 25 through p. 54, ll. 1-6.*

12. On December 31, 2020, Plaintiff was offered an appointment with her primary care physician but declined.

13. Nurse practitioner Jennifer Wheaton documented a follow-up note indicating Plaintiff was unhappy with the care she received in the emergency department and would be seeking care in the community.

14. Plaintiff testified that she requested a colonoscopy back in October of 2020 and was told by the VA that they were not doing colonoscopies due to COVID.

15. On February 11, 2021, Plaintiff underwent a colonoscopy due to blood in the stool in a facility outside the VA system in Fort Smith, Arkansas.

16. On February 24, 2021, Plaintiff was diagnosed with Stage III rectal cancer.

17. Plaintiff underwent chemotherapy, radiation and local excision of the lesion. At the time of trial, Plaintiff has no evidence of residual cancer. *Depo. of Dr. Zev Wainberg, p. 33, l. 1, p. 34, ll. 1-5.*

18.     Plaintiff presented the testimony of Dr. Colin Howden at trial.  Dr. Howden testified as an expert witness on behalf of Plaintiff as a gastroenterologist.  He testified that he performed between 500 and 700 colonoscopies per year while at Northwestern University.  *Tr. Part 2 at 28:09.*[1]

19.     Upon reviewing the record from the VAMC wherein Plaintiff called into the office to report alternating constipation and diarrhea, Dr. Howden stated that there is "no such thing as a normal bowel habit."  *Tr. Part 2 at 37:22.*  It is important to take down what normal bowel habit for that particular person might be.  *Tr. Part 2 at 37:46.*  Dr. Howden expressed no major criticism of Nurse Wheaton's advice reflected in the record that Plaintiff should go to the emergency room should she experience severe abdominal pain or blood in the stool.  *Tr. Part 2 at 39:23.*

20.     Dr. Howden noted the first diagnosis of irritable bowel syndrome occurred in Plaintiff's visit to her primary care physician.  He was "alarmed" at the high dose of Bentyl prescribed at that time.  *Tr. Part 2 at 42:48.*  He was "critical" of the dosage.  *Tr. Part 2 at 43:35.*

21.     Dr. Howden was not critical of the recommendation of fiber so long as it was accompanied by adequate water intake unless it caused further problems.  The prescribing of probiotics was not generally recommended by Dr. Howden but

---

[1] A transcript of the non-jury trial was unavailable to the Court at the time of the preparation of this Opinion and Order.  Accordingly, the references to the record at the trial pertain to the recording of the proceedings, which was divided by the Court's FTR recording system into eleven parts.  The references in this Opinion and Order indicate the part where the quotation or evidence was recorded and the approximate time within that part where the specific quotation or evidence cited is located.

5

he had no major criticism for trying the probiotics.  *Tr. Part 2 at 46:08.*

22.    While Dr. Howden recognized Plaintiff was a victim of abuse, he did not believe that this affected the diagnosis of IBS.  *Tr. Part 2 at 48:55.*  The association of IBS and abuse may be related but no direct causal relationship. *Tr. Part 2 at 48:25.*  IBS is most often diagnosed in late teenage years to early 30's.  *Tr. Part 2 at 50:45.*

23.    Dr. Howden stated that a screening colonoscopy is utilized when a patient is asymptomatic.  He did not criticize the notation in the record that a colonoscopy was "N/A until age 50."  *Tr. Part 2 at 52:37; Joint Exh. No. 1, p. 658.*

24.    In May of 2019, Plaintiff maintained taking Bentyl but at a reduced dosage. Dr. Howden stated that Bentyl is used for the treatment of pain for IBS but that Plaintiff reported no abdominal pain.  *Tr. Part 2, 58:26.*

25.    Dr. Howden stated that IBS can wax and wain in its symptoms.  *Tr. Part 2, 59:40.*  Plaintiff's report that she went two weeks without a bowel movement was considered "extreme" by Dr. Howden, which should "raise eyebrows" as it would not be typical with patients experiencing IBS.  *Tr. Part 2, 1:00:29.*

26.    In a September 2019 note, Plaintiff complained of abdominal pain, heartburn, constipation and diarrhea.  Dr. Howden found "it would have been reasonable to reconsider the diagnosis to consider other possibilities and to seek other specialist advice."  *Tr. Part 2, 1:00:50.*  However, Dr. Howden stated that he was not aware of the standard of care of a primary care physician in the VA system.  *Tr. Part 2, 1:03:31.*  Dr. Howden stated he was "critical" of the

6

September 6, 2019 note and believes other diagnoses should have been considered and specialist advice from a gastroenterologist should have been sought. *Tr. Part 2, 1:03:50.*

27.     Dr. Howden stated that Plaintiff's diagnosis of Stage III cancer could have been discovered sooner than February of 2021 if she had been given a colonoscopy for the consideration of alternatives to IBS. If she had been sent to a gastroenterologist, a colonoscopy would have likely been provided and the rectal lesion would have been detected. *Tr. Part 2, 1:05:53.*

28.     Dr. Howden stated it was "hard to say" when Plaintiff should have been sent for a colonoscopy but it should have been considered. *Tr. Part 3, 4:28.* He could not state when the cancer developed. *Tr. Part 3, 4:58.* He also found no indication that Plaintiff had a rectal digital examination. *Tr. Part 3, 6:15.* Dr. Howden stated that it is possible the two-centimeter lesion in Plaintiff's rectum could have been found if a digital examination had occurred. *Tr. Part 3, 7:17.*

29.     Dr. Wainberg testified in his deposition that if a patient comes in with IBS that is described as controlled, the failure to perform a digital examination is not a deviation from the standard of care. *Depo. of Dr. Zev Wainberg, p. 24, ll. 13-18.*

30.     Various publications indicated to Dr. Howden that the absence of abdominal pain excludes a diagnosis of IBS.

31.     Dr. Howden stated that he is not a family practitioner. *Tr. Part 3, 36:06.* He agreed with Plaintiff's counsel that "a reasonable standard was not met by

7

the VA" because "they seemed to rush to the diagnosis of IBS and not considered other possibilities and . . . not requested specialist advice." *Tr. Part 3, 36:31.*

32.  On cross examination, Dr. Howden stated that he was not aware of the standard of care to which a primary care physician at the VA was held to but that it was entirely reasonable for a physician to have considered other alternative diagnoses under the circumstances Plaintiff presented at that time. *Tr. Part 4, 3:19.* He could not state that the standard of care for the primary care physician to order a colonoscopy. *Tr. Part 4, 3:55.* He stated further that two doctors can have differing opinions with both within standard of care. *Tr. Part 4, 4:33.* While Dr. Howden was critical of the amount of Bentyl prescribed to Plaintiff, he did not contend that the level of this drug gave Plaintiff cancer. *Tr. Part 4, 5:07.*

33.  The American Family Physician article entitled, "Diagnosis and Management of IBS in Adults" identifies several "alarm features" which "should prompt investigation for other diseases." *Pl. Exh. No. 3, p. 6.* These "alarm features" include anemia, rectal bleeding, nocturnal symptoms, weight loss, recent antibiotic use, onset after 50 years of age, and family history. *Id.* The record does not indicate Plaintiff experienced any of these features. *Tr. Part 4, 8:27.*

34.  The United States retained Dr. Vladimir Kushnir as its expert gastroenterologist. He testified that IBS and functional intestinal disorders are addressed by the Rome Foundation which is a gathering of experts to develop

8

criteria for disorders and suggest treatment. *Tr. Part 9, 8:04.* Both Dr. Howden and Dr. Kushnir cited the Rome Foundation as the defining organization for gastric disorders.

35. Dr. Kushnir testified that times of stress can cause the release of cortisol which can affect the gastrointestinal system. *Tr. Part 9, 12:07.* People with prior life trauma such as sexual assaults are prone to experience functional intestinal disorders. *Tr. Part 9, 13:35.* Literature from the VA also indicates that combat veterans who experience trauma are at a higher risk for functional intestinal disorders. *Tr. Part 9, 14:42.*

36. Testing for these conditions is tailored to the individual. Some testing including colonoscopies, involve some risk. *Tr. Part 9, 15:30.* The risk in such testing must be balanced with the benefit. *Tr. Part 9, 15:46.* Invasive testing, and many forms of non-invasive testing, has very low yield in diagnosing and treating IBS. *Tr. Part 9, 16:07.* If the patient does not have alarm symptoms such as blood in the stool, weight loss, very limited diagnostic testing is recommended based upon the predominant symptom. *Tr. Part 9, 16:29.* While there is limited testing recommended for various conditions based upon the symptoms presented, invasive testing is not recommended, such as a colonoscopy. *Tr. Part 9, 17:32.*

37. Digital rectal examination is indicated with incontinence or a change in stool. *Tr. Part 9, 20:24.* However, it is difficult to detect rectal cancer with a digital examination. *Tr. Part 9, 22:30.* Plaintiff's polyp giving rise to her cancer

9

was a flat variety which is difficult to detect.  *Tr. Part 9, 24:51.*

38.  A single blood test does not exist to detect colorectal cancer.  *Tr. Part 9, 25:20.*  There are often no early stage symptoms for colorectal cancer.  *Tr. Part 9, 25:32.*  Symptoms a doctor would look for to detect colorectal cancer are the previously referenced alarm symptoms.  *Tr. Part 9, 26:28.*  Those symptoms would justify a colonoscopy.  *Tr. Part 9, 27:12.*

39.  Prior to December of 2020, Dr. Kushnir did not denote any of the alarm symptoms in Plaintiff from the medical record.  *Tr. Part 9, 30:31.*  Records from Plaintiff's colonoscopy indicate a digital examination was performed, which is the standard of care.  *Tr. Part 9, 32:36.*  The digital examination of Plaintiff revealed no abnormalities.  *Tr. Part 9, 33:10.*

40.  Dr. Kushnir testified that the diagnosis of IBS reflected in the April 6, 2018 note in Plaintiff's medical record does not demonstrate a deviation from the standard of care.  *Tr. Part 9, 35:34.*  The recommendation for a probiotic, fiber, and an anti-spasmodic such as Bentyl is typical for someone presenting with IBS.  *Tr. Part 9, 35:45.*

41.  Dr. Kushnir was also presented with the medical record from May 24, 2018.  The record indicated a normal CBC.  *Tr. Part 9, 37:20.*  Plaintiff had no family history of colorectal cancer, which is a main risk factors for the disease.  *Tr. Part 9, 37:49.*  The record showed Plaintiff's IBS was "controlled" meaning the symptoms had responded to treatment and the provider recommended continuing prior treatment.  *Tr. Part 9, 38:17.*

42.     Dr. Kushnir reviewed Plaintiff's medical record from approximately one year later.  Plaintiff was provided with medication for IBS and the dosage depended upon whether it flares, which Dr. Kushnir stated was common.  *Tr. Part 9, 39:57.*  The record does not indicate the presence of any alarm symptoms.  *Tr. Part 9, 40:30.*

43.     Dr. Kushnir reviewed the record from September 2019 indicated no alarm symptoms but indicated a flare upon of functional gastrointestinal disorder.  *Tr. Part 9, 42:10.*  Nothing represented in this record deviated from the standard of care.  *Tr. Part 9, 42:30.*

44.     Dr. Kushnir was presented with the medical record from October 22, 2020. He indicated that it was not a deviation from the standard of care for a physician to not give the patient a colonoscopy when she asks for it.  *Tr. Part 9, 42:44.* The physician must determine whether the test is indicated or not.  *Id.*  In the absence of alarm symptoms, Dr. Kushnir testified he would not have ordered a colonoscopy for Plaintiff at this time.  *Tr. Part 9, 44:29.*  Wait times for colonoscopies were extended in these early times of the COVID pandemic.  *Tr. Part 9, 45:00.*

45.     Dr. Kushnir did not believe that cancer was causing a change in Plaintiff's bowel habits in 2018 and 2019.  *Tr. Part 9, 44:29.*  He did not believe a tumor was obstructing her bowels.  *Tr. Part 9, 45:46.*

46.     While it was a judgment call of the physician, Dr. Kushnir did not believe it was a deviation from the standard of care to not perform a digital exam prior

to the 2020 emergency room visit.  *Tr. Part 9, 46:04.*

## **CONCLUSIONS OF LAW**

A. This Court possesses the appropriate jurisdiction over the parties and subject matter of this action.  28 U.S.C. §§ 1346(b), 1402(b), 2401 and 2675.  Further, venue is proper in this district.  28 U.S.C. § 1391(e).

B. Any finding of fact which is more appropriately described as a conclusion of law shall stand as such.  Similarly, any conclusion of law which might be considered as a finding of fact will be so deemed.

C. The standard of care generally applied to physicians requires that the physician exercise the care, skill, and learning ordinarily exercised by other physicians under similar circumstances.  *Sisson v. Elkins*, 801 P.2d 722, 727 (Okla. 1990) citing *Karriman v. Orthopedic Clinic,* 516 P.2d 534, 540 (Okla. 1973).  The conduct of the physician is measured against those engaged in the same field of practice at the time in question.  *Boyanton v. Reif*, 798 P.2d 603, 604-5 (Okla. 1990).  The standard of care required for those engaged in the practice of the healing arts in Oklahoma is measured by national standards.  *Grayson v. State,* 838 P.2d 546, 550 (Okla. Ct. App. 1992) citing *Spencer v. Seikel*, 742 P.2d 1126 (Okla. 1987).

D. "The applicable standard of care and deviations therefrom causing an injury are ordinarily established by expert testimony, unless the common knowledge of lay persons would enable a jury to conclude the applicable standard of care and whether its breach caused the injury."  *Johnson v. Hillcrest*

12

*Health Ctr., Inc.,* 70 P.3d 811, 817 (Okla. 2003); *Grayson,* 838 P.2d at 549 ("A plaintiff has the burden of proving through expert testimony: (1) the standard of medical care required of physicians, (2) that a duty existed and was breached, and (3) that this breach of duty resulted in harm to the plaintiff."). "In medical negligence cases, the plaintiff bears the burden of proving, through expert testimony, the standard of medical care required of physicians, the breach of an existing duty, and that this breach of duty resulted in harm to the plaintiff." *Ondobo v. Integris Baptist Med. Ctr. Inc.*, 543 P.3d 1229, 1235 (Okla. Ct. Civ. App. 2024) citing *Burleson v. Wayne*, 495 P.3d 146 (Okla. Ct. Civ. App. 2021).

The breaches alleged by Plaintiff in this action do not fall within the type for which the finder of fact's common knowledge would obviate the need for expert testimony. Namely, Plaintiff has alleged that it breached the standard of medical care for Dr. Stephens to have failed to perform a digital examination and failed to seek specialist advice and order a colonoscopy prior to December of 2020.

E.  Dr. Howden was the expert retained by Plaintiff and presented to inform the Court as to the standard of care for these alleged omissions. Dr. Howden expressly stated that he did not know the standard of care for a primary care physician at the VAMC. Upon repeated examination on the subject, he maintained his stance and declined to establish whether Dr. Stephens' actions were below the standard of care. Instead, Dr. Howden offered professional opinions on what he would have done in a similar circumstance or that it would

13

have been "reasonable and appropriate" for Dr. Stephens to have performed a digital exam and ordered a colonoscopy earlier in his encounter with Plaintiff. These expressions of professional discretionary opinion do not satisfy the requirement of establishing the applicable standard of care.

F. Plaintiff contends that the "magic words" of "standard of care" are not necessary to satisfy the requirements for expert testimony, citing *Jones v. Mercy Health Ctr., Inc.*, 155 P.3d 9 (Okla. 2006). However, Dr. Howden's omission goes well beyond semantics and, given the opportunity to do so, he declined to provide the appropriate standard of care and whether Dr. Stephens breached it. Terms such as being "critical" of a physician's actions or identifying a course of action which is medically "reasonable and appropriate" trends toward offering a personal, professional opinion as to how Dr. Howden would have proceeded which is far removed from the national standard of care required under Oklahoma law.

G. Dr. Kushnir identified that the actions of Dr. Stephens in not performing a digital examination or ordering a colonoscopy at the specified times when he attended Plaintiff did not fall below the national standard of care for primary care physicians. Faced with this contrast in the evidence and the offered medical expert opinions, this Court finds that Plaintiff failed to meet her burden of establishing the standard of care or that Dr. Stephens breached that standard in the actions he took to identify and diagnose Plaintiff's condition.

H. To the extent Plaintiff also seeks to extend medical negligence liability

14

to the actions of the medical staff at the VAMC, Plaintiff failed in her burden of establishing the standard of care of each of the medical professionals providing services to Plaintiff during her care at the VA and failed to establish any breach of the duty owed to Plaintiff.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that judgment is entered in favor of the Defendant United States of America and against Plaintiff Mellissa Mulligan on the claims asserted by Plaintiff in this action.

A separate judgment shall issue forthwith.

IT IS SO ORDERED this 30th day of September, 2025.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE